In the Matter of Delbert SNYDER,
Deanna Snyder, and Robert
Snyder, Debtors–Appellants.

Farm Credit Bank of St. Louis,
Cross–Appellant.

Nos. 90–3612, 90–3667.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 10, 1991.

Decided July 9, 1992.

Robert Lindstrom, Mustain & Lindstrom, Galesburg, Ill. (argued), for Farm Credit Bank of St. Louis.

Gregg N. Grimsley, Vonachen, Lawless, Trager & Slevin, Peoria, Ill. (argued), for Delbert, Deanna and Robert Snyder.

Before BAUER, Chief Judge, CUDAHY, Circuit Judge, and WILL, Senior District Judge.[*]

CUDAHY, Circuit Judge.

Delbert, Deanna and Robert Snyder (the Debtors), who own and operate a farm in Central Illinois, filed for bankruptcy pursuant to Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1101–1174. They seek approval of their amended plans of reorganization on the basis of the "new value" or "fresh capital" exception to the absolute priority rule. Farm Credit Bank of St. Louis (Farm Credit), their principal creditor, asks us to declare that the new value exception did not survive enactment of the Bankruptcy Code of 1978. The bankruptcy court and the district court held that the Debtors' plans failed to meet the requirements of the new value exception. We affirm.

I.

The Debtors are engaged in a joint farm operation known as "Snyder Brothers." As of June 17, 1988, the date of filing of the bankruptcy petition, they were indebted to Farm Credit in the approximate amount of $1,481,000. As security, Farm Credit had a first mortgage on 510 acres of farmland owned by the Debtors. The Debtors value the land at $581,104 and Farm Credit values it at $745,900. The Debtors owed $248,000 to Farmers Home Administration, which had a lien on the Debtors' jointly owned machinery valued at $118,650. The Debtors also owed Alden Snyder (the father of Delbert and Robert) $126,794, which was secured by vehicles having a fair market value of $20,000. Finally, the Debtors have another unsecured creditor, Delbert Wright, who was owed $20,000 at the date of filing. The Debtors determine their total unsecured indebtedness to be $1,055,351.

The Debtors' original plans of reorganization provided that they would retain the jointly owned farmland, Farm Credit's secured debt would be written down to the value of the farmland, unsecured creditors would be paid ten percent of their total claims and their father would release his claims. The bankruptcy court rejected the Debtors' original plans, finding that, while the new value exception was still viable, the father's release of his claims did not constitute a contribution of new value. *In re Snyder*, 99 B.R. 885 (Bankr.C.D.Ill. 1989).

The Debtors filed amended plans of reorganization under which the Debtors, in addition to paying unsecured creditors ten percent of their claims over a period of ten years, would contribute $30,000 (from a third party's donation), provide use of the farm machinery free and clear of their father's lien and pay the value of the machinery, $20,000, to unsecured creditors over five years. The bankruptcy court again denied confirmation of the plans of reorganization and ordered the Chapter 11 proceedings dismissed. Again the court held that the new value exception survived enactment of the Bankruptcy Code of 1978. The court found, however, that the $30,000 cash contribution and the $20,000 value of the machinery (from Alden Snyder's re-

[*] The Honorable Hubert L. Will, Senior District Judge of the United States District Court for the Northern District of Illinois, sitting by designation.

lease of his lien) were inadequate to qualify for the new value exception to the absolute priority rule. *In re Snyder*, 105 B.R. 898 (Bankr.C.D.Ill.1989). The district court affirmed, declining to address the viability of the new value exception but agreeing that the Debtors' amended plans failed in any event to meet the requirements of such an exception.

## II.

The absolute priority rule can be traced at least as far back as the Supreme Court's decision in *Northern Pacific Ry. Co. v. Boyd*, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913).[1] The rule is generally described as providing that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property under a reorganization plan. *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202, 108 S.Ct. 963, 966, 99 L.Ed.2d 169 (1988). In *Boyd* and other cases decided under the pre–1978 bankruptcy statute, the absolute priority rule arose in judicial construction of the statutory requirement that reorganization plans be "fair and equitable." The Bankruptcy Code of 1978 codified the absolute priority rule, providing that a plan's treatment of unsecured creditors is "fair and equitable" if "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." 11 U.S.C. § 1129(b)(2)(B)(ii). In addition to codifying the absolute priority rule, the 1978 Code altered the general scheme of plan confirmation by allowing a plan to be confirmed by consent of the impaired classes, in the form of one-half of the voting claimants in the class (representing two-thirds of the claims in value). 11 U.S.C. § 1126(c). When the creditors do not consent to a plan, the court must nevertheless confirm it if it does not discriminate unfairly and is "fair and equitable" to each dissenting class. 11 U.S.C. § 1129(b)(1). It is in this situation (the "cramdown") that the absolute priority rule comes into play under the Code.

For nearly as long as the courts have enforced the absolute priority rule, they have also recognized an exception[2] to the rule for "new value" or "fresh capital." In *Kansas City Terminal Ry. v. Central Union Trust Co.*, 271 U.S. 445, 46 S.Ct. 549, 70 L.Ed. 1028 (1926), the Supreme Court noted that in the course of reorganization "additional funds will be essential to the success of the undertaking, and it may be impossible to obtain them unless stockholders are permitted to contribute and retain an interest sufficiently valuable to move them." The Court strongly embraced this concept in *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 121, 60 S.Ct. 1, 10, 84 L.Ed. 110 (1939), finding it "clear that there are circumstances under which stockholders may participate in a plan of reorganization of an insolvent debtor." The circumstances justifying owner participation (even where the dissenting unsecured creditor class is not paid in full) included the "necessity" of such a fresh contribution to the success of the undertaking; further, the Court declared, the owner's participation "must be based on a contribution in money or money's worth, reasonably equivalent in view of all the circumstances to the participation of the stockholder." *Id.* at 121–22, 60 S.Ct. at 10.

With the enactment of the Bankruptcy Code of 1978, courts began to face the question whether *Los Angeles Lumber*'s new value exception remained viable. The Supreme Court expressly declined to answer the question in *Ahlers*, 485 U.S. at

1. For a tracing-back even further, to the nineteenth-century law of fraudulent transfers and equity receiverships, *see* Bruce A. Markell, *Owners, Auctions, and Absolute Priority in Bankruptcy Reorganizations*, 44 Stan.L.Rev. 69, 74–83 (1991).

2. We follow common usage among authorities in referring to the new value principle as an "exception" to the absolute priority rule. As discussed below, however, some recent commentators argue that the new value principle is more accurately characterized as a corollary than an exception.

203 n. 3, 108 S.Ct. at 967 n. 3.[3] Two panels of this Court have discussed the issue, but have also left the question open. *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351, 1362 (7th Cir. 1990); *In re Stegall,* 865 F.2d 140, 142 (7th Cir.1989). The bankruptcy courts have been divided, although the more widely held view is that the new value exception survived the Code's adoption. *Compare, e.g., In re Pullman Construction Industries, Inc.,* 107 B.R. 909 (Bankr.N.D.Ill. 1989), *with, e.g., In re Pine Lake Village Apartment Co.,* 19 B.R. 819 (Bankr. S.D.N.Y.1982).

Opponents of the continued vitality of the new value exception have pointed to the language of the 1978 Code, in particular the codification of the absolute priority rule without any explicit exception for new value. *See, e.g., Kham & Nate's Shoes,* 908 F.2d at 1361; *In re Greystone III Joint Venture,* 948 F.2d 134, 143 (5th Cir.1991) (Jones, J., dissenting from grant of rehearing).[4] But their approach seems to slight a settled canon of interpretation: "[I]f Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific. The Court has followed this rule with particular care in construing the scope of bankruptcy codifications." *Midlantic Nat'l Bank v. New Jersey Dep't of Environmental Protection,* 474 U.S. 494, 501, 106 S.Ct. 755, 759, 88 L.Ed.2d 859 (1986) (citation omitted); *accord Davis v. Michigan Dep't of Treasury,* 489 U.S. 803, 813, 109 S.Ct. 1500, 1506, 103 L.Ed.2d 891 (1989). This year the Court further explained:

When Congress amends the bankruptcy laws, it does not write "on a clean slate." Furthermore, this Court has been reluctant to accept arguments that would interpret the Code, however vague the particular language under consideration might be, to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history.

*Dewsnup v. Timm,* —— U.S. ——, 112 S.Ct. 773, 779, 116 L.Ed.2d 903 (1992) (citations omitted) (quoting *Emil v. Hanley,* 318 U.S. 515, 521, 63 S.Ct. 687, 690, 87 L.Ed. 954 (1943)). There is nothing in either the text or the legislative history of § 1129(b) that can be said to demonstrate a clear intent to modify seventy-five years of judicial construction of the absolute priority doctrine or its new value exception. The mere fact that Congress did not separately codify the exception does not establish its elimination, for Congress is presumed to have been aware of the courts' interpretations of the contours of the absolute priority rule when it codified the rule. *See Midlantic Nat'l Bank,* 474 U.S. at 501, 106 S.Ct. at 759.

In urging the elimination of the exception, a number of authorities have relied on Congress's rejection of the Bankruptcy Commission's proposal to modify the absolute priority rule. *See, e.g., Kham & Nate's Shoes,* 908 F.2d at 1361–62; *Greystone III Joint Venture,* 948 F.2d at 143. As Bankruptcy Judge Schmetterer explained in *Pullman Construction,* however, the Commission's proposal would have modified the rule to allow owners to participate in the reorganized debtor *without* putting up new capital—i.e., through contributions other than "money or money's worth." 107 B.R. at 948; *Report of the Commission on the Bankruptcy Laws*

---

**3.** In *Ahlers,* the Solicitor General, as *amicus curiae,* had urged the Court to hold that the 1978 Bankruptcy Code "dropped the infusion-of-new-capital exception to the absolute priority rule." 485 U.S. at 203 n. 3, 108 S.Ct. at 967 n. 3. The Court did not reach the issue, concluding that "even if an 'infusion-of-"money-or-money's worth"' exception to the absolute priority rule has survived the enactment of § 1129(b), respondents' proposed contribution to the reorganization plan is inadequate to gain the benefit of this exception." *Id.* 485 U.S. at 204 n. 3, 108 S.Ct. at 9 n. 3.

**4.** The Fifth Circuit originally held in *Greystone III Joint Venture* that the new value exception was eliminated by the Bankruptcy Code of 1978. On rehearing, however, the panel withdrew that portion of the majority opinion (which was then incorporated into the dissenting opinion of Judge Jones). The Fifth Circuit's self-reversal on the new value exception appears to have been based, at least in part, on *Dewsnup v. Timm,* —— U.S. ——, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992), in which the Supreme Court explained how Code provisions must be interpreted in light of pre-Code practices.

*of the United States*, H.R.Doc. No. 93–137, 93d Cong., 1st Sess. pt. I § 7–303(4) at 259 (1973). Rather than rejecting the new value exception wholesale, Congress "only rejected the Commission's proposed relaxation of the rule's requirements." Bruce A. Markell, *Owners, Auctions, and Absolute Priority in Bankruptcy Reorganizations*, 44 Stan.L.Rev. 69, 103 (1991). Indeed, the Commission's proposal presupposed the existence of the new value exception, and Congress's rejection of the modification could just as easily be construed as an endorsement of the status quo. Since there is no other discussion of modifying or eliminating the new value exception in the legislative history, pre-Code practice would appear to control under the standard articulated in *Dewsnup*.

In addition, several commentators have recently argued powerfully that the new value "exception" is not an exception at all, but is consistent with the absolute priority rule as codified in § 1129(b). *See* Brief of Professor Elizabeth Warren as Amicus Curiae at 4–11, *In re Greystone III Joint Venture*, 948 F.2d 134 (5th Cir.1991) (No. 90–8529); Raymond T. Nimmer, *Negotiated Bankruptcy Reorganization Plans: Absolute Priority and New Value Contributions*, 36 Emory L.J. 1009, 1051 (1987); Markell, 44 Stan.L.Rev. at 96–102; *accord Snyder*, 99 B.R. at 888; *Pullman Construction*, 107 B.R. at 945. Section 1129 bars old equity from receiving an interest under the plan *"on account of"* its prior equitable ownership. But when owners infuse necessary new value into the enterprise in the form of money or money's worth, the source of their retained interest is not their prior ownership, but rather their new contribution. If, as these authorities contend, the new value "exception" is not an exception but a *corollary* to the absolute priority rule, then it must have survived enactment of the 1978 Code. *Midlantic Nat'l Bank*, 474 U.S. at 501, 106 S.Ct. at 759.

Finally, there are strong policy arguments that favor retention of the new value exception. Owners often have valuable information about the enterprise that outsiders lack, and owner participation allows this information to be put to use.[5] In addition, owners may have incentives, including noneconomic incentives, to provide necessary new value that cannot be obtained elsewhere. Some of our distinguished colleagues on this Court have suggested that the creditor-consent provisions of the Code are sufficient to protect any possible benefits of owner participation, and that such participation should have no place in the cramdown situation. *Kham & Nate's Shoes*, 908 F.2d at 1360–61; *Stegall*, 865 F.2d at 142. But there are many reasons why creditors (often a single controlling creditor) withhold consent, and it is not clear why prior owners should be excluded from participation based on a new contribution when a third party could buy ownership of the enterprise under a crammed-down plan.[6]

The Debtors ask us to hold that the new value exception remains viable under the 1978 Code, while Farm Credit asks us to

---

**5.** Professor Markell has drawn on auction theory to argue that this information may be an important reason to allow owner participation. Markell, 44 Stan.L.Rev. at 107–11; *see also* Amicus Brief of Professor Warren, *Greystone III Joint Venture*, at 17.

**6.** Markell, 44 Stan.L.Rev. at 106–07; Amicus Brief of Professor Warren, *Greystone III Joint Venture*, at 14; *cf. In re Met–L–Wood Corp.*, 861 F.2d 1012, 1019 (7th Cir.1988) ("It is commonplace, and involves no impropriety, for the debtor himself to bid at a foreclosure sale."), *cert. denied sub nom. Gekas v. Pipin*, 490 U.S. 1006, 109 S.Ct. 1642, 104 L.Ed.2d 157 (1989). The new value exception may also serve to prevent inequity which can result from a rigid application of the absolute priority rule, as illustrated by the facts of *In re Jartran, Inc.*, 44 B.R. 331 (Bankr.N.D.Ill.1984). In that case, the parties had tried unsuccessfully for three years to sell the debtor, a truck rental company, to a third-party investor. The proposed plan allowing the equity holders to retain an ownership interest represented the only feasible means of reorganization. The plan was rejected, however, by the class of creditors controlled by U–Haul, a direct competitor of the company. U–Haul had an interest in liquidating the company; concerns of equity strongly favored confirmation of the plan through an application of the new value exception. *See* Clifford S. Harris, Note, *A Rule Unvanquished: The New Value Exception to the Absolute Priority Rule*, 89 Mich.L.Rev. 2301, 2317 (1991).

hold that it has vanished. We stop short of both parties' requests, as we did in *Kham & Nate's Shoes* and *Stegall*, and as the Supreme Court did in *Ahlers*. We conclude instead that, assuming the new value exception retains its vitality, the Debtors' proposed contribution fails to meet its requirements. We therefore again reserve the issue of the new value exception's continued viability for another day.

In *Los Angeles Lumber* the Supreme Court declared that a qualifying new value contribution must be (1) necessary to the reorganization; (2) in the form of money or money's worth; and (3) reasonably equivalent to the interest retained. 308 U.S. at 121–22, 60 S.Ct. at 10–11. The cases also make clear that a contribution must be substantial, *In re Potter Material Serv., Inc.*, 781 F.2d 99, 101 (7th Cir.1986), and "up front," *In re Stegall*, 85 B.R. 510, 514 (C.D.Ill.1987), *aff'd*, 865 F.2d 140 (7th Cir. 1989); *In re Olson*, 80 B.R. 935, 937 (Bankr.C.D.Ill.1987), *aff'd*, 1989 U.S. Dist. Lᴇxɪs 18177 (C.D.ILL.1989).

■ The Debtors first propose to obtain a release of their father's lien on their farm machinery and to pay the creditors the value of the machinery ($20,000) over five years. This contribution, however, is not an up-front infusion of money or money's worth. Like the promises of future labor rejected in *Los Angeles Lumber* and *Ahlers*, and the guarantees rejected in *Kham & Nate's Shoes*, the release of the lien "has no place in the asset column of the balance sheet of the new [entity]." *Los Angeles Lumber*, 308 U.S. at 122–23, 60 S.Ct. at 10–11, *quoted in Ahlers*, 485 U.S. at 204, 108 S.Ct. at 967, *and Kham & Nate's Shoes*, 908 F.2d at 1362. Further, the future payments from the farm's operation are not "up front" and do not constitute the sort of infusion of new funds "essential to the success of the undertaking" contemplated by the new value exception. *Los Angeles Lumber*, 308 U.S. at 121, 60 S.Ct. at 10.

■ The other component of the Debtors' proposed contribution is a $30,000 cash payment. The bankruptcy court and the district court held that the proposed payment was not substantial and therefore insufficient to qualify for the new value exception. In particular, the courts observed that the $30,000 contribution amounted to only 2.7 percent of the $1,100,-000 due unsecured creditors, and 3.3 percent of the unsecured debt owed to Farm Credit. The Debtors argue that the lower courts should not have compared the amount of the proposed contribution to the amount of unsecured debt in determining whether the contribution is substantial. Instead, they argue, to be substantial the amount contributed must be equal only to the value of the interest retained under the plan. This Court, however, has previously rejected such an interpretation of the "substantial" requirement. *Stegall*, 865 F.2d at 144. The requirement that a contribution be substantial is independent of the rule that a contribution must be at least equal to the value of the interest retained. *See Potter Material Serv., Inc.*, 781 F.2d at 101. The substantiality requirement is derived not from *Los Angeles Lumber*'s third criterion, but from its first—that an infusion of new capital must be necessary to the success of the undertaking. Contributions that are merely nominal, or "gratuitous, token cash infusions proposed primarily to 'buy' cheap financing," will not suffice. *Greystone III Joint Venture*, 102 B.R. 560, 575 (Bankr.W.D.Tex.1989), *rev'd on other grounds*, 948 F.2d 134 (5th Cir. 1991); *see also Stegall*, 865 F.2d at 144.

The bankruptcy court and the district court committed no error in finding the proposed $30,000 payment not sufficiently "substantial" to qualify for the new value exception.[7] We cannot say that the determination as to whether an infusion of new capital is "substantial" will always hinge on a comparison to the total amount of unsecured debt. There is no mathematical formula for resolving the substantiality is-

---

7. Even assuming that the $20,000 five-year payment from the machinery's value constitutes an up-front contribution of "money or money's worth," the total resulting contribution of $50,-000 is insubstantial. It would amount to just 4.5 percent of the total amount due unsecured creditors, and 5.5 percent of the amount due Farm Credit.

sue, and it will depend on the circumstances of the individual case. In the instant case, where the disparity between the contribution and the unsecured debt is so extreme, we agree with the courts below that there is no need to proceed any further and that the proposed contribution is not substantial.

### III.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.